[S.F. No. 24401. May 19, 1983.]

SAN MATEO CITY SCHOOL DISTRICT, Petitioner, v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent;
SAN MATEO ELEMENTARY TEACHERS' ASSOCIATION, CTA, NEA,
Real Party in Interest.

CALIFORNIA SCHOOL EMPLOYEES ASSOCIATION, Petitioner, v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent;
HEALDSBURG UNION HIGH SCHOOL DISTRICT et al.,
Real Parties in Interest.

HEALDSBURG UNION HIGH SCHOOL DISTRICT et al., Petitioners, v.
PUBLIC EMPLOYMENT RELATIONS BOARD, Respondent;
CALIFORNIA SCHOOL EMPLOYEES ASSOCIATION,
Real Party in Interest.

COUNSEL

William E. Brown, Nancy B. Ozsogomonyan and Brown & Conradi for Petitioner San Mateo City School District.

Peter A. Janiak, Madalyn J. Frazzini, E. Luis Saenz, Maureen C. Whelan and Siona D. Windsor for Petitioner and Real Party in Interest California School Employees Association.

V. T. Hitchcock and Rene Auguste Chouteau for Petitioners and Real Parties in Interest Healdsburg Union High School District and Healdsburg Union School District.

Keith C. Sorenson, District Attorney (San Mateo), and Lillian Lee Port, Assistant District Attorney, as Amici Curiae on behalf of Petitioners.

Fred H. Altshuler, Marsha S. Berzon, Altshuler & Berzon, Dennis M. Sullivan, Jeffrey Sloan, Elaine B. Feingold and Barry Winograd for Respondent.

Kirsten L. Zerger, Raymond L. Hansen and Diane Ross for Real Party in Interest San Mateo Elementary Teachers Association.

Diana D. Halpenny, John L. Bukey and Walters, Bukey & Shelburne as Amici Curiae on behalf of Real Parties in Interest Healdsburg Union High School District and Healdsburg Union School District.

Van Bourg, Allen, Weinberg & Roger, Stewart Weinberg, Robert A. Galgani, John I. Meeker and Breon, Galgani, Godino & O'Donnell as Amici Curiae.

OPINION

**REYNOSO, J.**—The San Mateo City School District petitions for review of a decision of the Public Employment Relations Board (PERB) finding it committed unfair labor practices by refusing to meet and negotiate on certain contract proposals made by the representatives of its certified employees. The Healdsburg Union High School and Healdsburg Union School Districts and the California School Employees Association each petition for review of a PERB decision finding the Healdsburg Districts committed unfair labor practices by refusing to negotiate over certain contract proposals and finding that other proposals were outside the scope of representation defined by the Educational Employment Relations Act, Government Code section 3540 et seq. The Court of Appeal issued writs of review and consolidated the cases because all present important questions of first impression regarding the scope of collective negotiations between public school employees and school districts.

The issues before us are whether PERB, as an administrative agency authorized by law to administer the Educational Employment Relations Act, has articulated a test for determining negotiability which is consistent with the purposes and policies of the Act, and whether PERB correctly determined the negotiability of the contract proposals at issue.

After the decisions which form the basis for this litigation were rendered the Legislature acted to increase membership on PERB from three members to five. A majority of these five members has resolved the inconsistencies ap-

parent in the opinions before us in a later decision. We conclude that PERB has now developed a test for negotiability which properly implements the Government Code. Accordingly, we remand these cases to PERB for reconsideration of the specific contract proposals in light of the later decision and the views expressed in this opinion.

## Factual Background

The *San Mateo* case arose out of a dispute as to whether the allocation of the teachers' work day between instructional duty time, preparation time, and rest time is a proper subject of negotiation under the Educational Employment Relations Act (the Act or the EERA), and whether the San Mateo City School District (the San Mateo District) is therefore precluded from unilaterally changing the length of the student instructional day without engaging in requested negotiations over the impact of that change on the amount of time during the school day available to teachers for preparation. The San Mateo Elementary Teachers Association (SMETA) presented contract proposals with provisions regarding instructional duty time, preparation and rest time during negotiations for the 1976-1977 and the 1977-1978 contract years. The San Mateo District refused to negotiate over preparation time and twice unilaterally adopted policy changes which increased the length of the instructional day.

A majority of PERB's three members found all three subjects to be within the scope of representation defined by the Act in Government Code section 3543.2.[1] PERB found that the San Mateo District had violated section 3543.5, subdivision (c) by refusing to meet and negotiate in good faith on these topics and over the effects of changes in the length of the student instructional day on the teacher instructional day and preparation time. A charge that the San Mateo District had refused to negotiate over rest time in the 1977-1978 sessions was dismissed upon a finding that it had, in fact, presented at least one substantive proposal on the matter. (*San Mateo Elem. Teachers' Assn.* v. *San Mateo City Sch. Dist.* (May 20, 1980), PERB Dec. No. 129.)

The *Healdsburg* case arose after the Healdsburg Union High School and Healdsburg Union School Districts refused to negotiate on items contained in 13 articles of a 107-page form contract submitted by the California School Employees Association (CSEA) during negotiations for the 1976-1977 year. The districts asserted the subjects were outside the scope of representation defined by the EERA.[2]

---

[1] All statutory references are to the Government Code unless otherwise indicated.

[2] The disputed articles are entitled: article II, No Discrimination; article V, Organizational Rights; article VI, Job Representatives; article X, Employee Expenses and Materials; article XI, Rights of Bargaining Unit Upon Change in School Districts; article XVII, Hiring; article XIX,

In a combination of majority and concurring and dissenting opinions PERB ruled that specified portions of 12 of the articles were subjects upon which the Healdsburg Districts were required to negotiate. PERB found the refusal to do so a violation of subdivisions (b) and (c) of section 3543.5 in that the Healdsburg Districts had refused to negotiate over negotiable subjects and had interfered with the exclusive representative's right to negotiate an agreement on behalf of the unit members. PERB dismissed the unfair practice allegation with regard to article XI[3] (*Calif. Sch. Employees Assn.* v. *Healdsburg Union High Sch. Dist. and Healdsburg Union Sch. Dist.* (June 19, 1980), PERB Dec. No. 132.)

I

The EERA establishes a system of collective bargaining for employees of public school districts educating students in grades kindergarten through 14. It was enacted in 1975 (Stats. 1975, ch. 961, § 2, p. 2247, operative July 1, 1976; codified as §§ 3540-3549.3). The Act requires the school district employer to meet and negotiate in good faith with the duly selected exclusive representative of its employees as to subjects within the statutorily defined scope of representation. (§§ 3543.3, 3543.5.) The parties may enter into a binding agreement (§ 3540.1, subd. (h)), and may agree that disputes involving interpretation, application or violation of the agreement be resolved through binding arbitration (§§ 3548.5, 3548.6, 3548.7). The employer must negotiate in good faith and must submit to mediation and advisory fact-finding where an impasse in negotiations is determined to have been reached. (§§ 3548-3548.3.) But the final decision as to the terms of the negotiated agreement, including those matters within the scope of representation, is reserved to the employer. (§ 3549.)

The purpose of the EERA is set forth in section 3540: "to promote the improvement of personnel management and employer-employee relations within the public school systems in . . . California by providing a uniform basis for recognizing the right of public school employees to join organizations of their own choice, to be represented by such organizations in their professional and employment relationships with public school employers, to select one employee

---

Promotion; article XX, Classification, Reclassification and Abolition of Positions; article XXI, Layoffs and Reemployment; article XXII, Disciplinary Action; article XXIV, Working Conditions; article XXVI, Training; article XXVII, Contracting and Bargaining Unit Work.

[3]PERB described article XI as an attempt to prohibit the Healdsburg Districts from deciding whether to e.g., deunify the school districts if such decision would affect the rights of unit employees or the status of CSEA as exclusive bargaining representative. This intruded on essential management prerogatives.

organization as the exclusive representative of the employees in an appropriate unit, and to afford certificated employees a voice in the formulation of educational policy."

The Act created PERB as an independent board of three members appointed by the Governor[4] with broad powers and duties to administer the Act. (§ 3541.3.) Generally, PERB is empowered to decide contested matters pertaining to all aspects of the selection and certification of employee organizations, to oversee and facilitate the negotiating process established by the Act, to adopt rules and regulations, conduct studies, recommend legislation and maintain research and training programs to effectuate the purposes of the Act, to hold hearings and order remedies for violations of the Act, and to seek court orders enforcing its own orders, decisions and rulings.

PERB is specifically empowered to "determine in disputed cases whether a particular item is within or without the scope of representation" and to investigate unfair practice charges and "take such action and make such determinations in respect of such charges . . . as the board deems necessary to effectuate the policies of [the Act]." (§ 3541.3, subds. (b) and (i).) The initial determination of whether unfair practice charges are justified is within the exclusive jurisdiction of PERB. (§ 3541.5.)

Interpretation of the statutory provision defining scope of representation thus falls squarely within PERB's legislatively designated field of expertise. ■ Under established principles PERB's construction is to be regarded with deference by a court performing the judicial function of statutory construction, and will generally be followed unless it is clearly erroneous. (*Highland Ranch* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 848, 859 [176 Cal.Rptr. 753, 633 P.2d 949]; *J.R. Norton Co.* v. *Agricultural Labor Relations Bd.* (1979) 26 Cal.3d 1, 29 [160 Cal.Rptr. 710, 603 P.2d 1306]; *Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 325 [109 P.2d 935].)

Subdivision (a) of section 3543.2 provides: "The scope of representation shall be limited to matters relating to wages, hours of employment, and other terms and conditions of employment. 'Terms and conditions of employment' mean health and welfare benefits as defined by Section 53200, leave, transfer and reassignment policies, safety conditions of employment, class size, pro-

---

[4]Originally titled the Educational Employment Relations Board, the name was changed as anticipated, when in 1977 the board was given jurisdiction to administer state employer-employee relations pursuant to chapter 10.3 of the Government Code. (§ 3513, subd. (g); enacted by Stats. 1977, ch. 1159, § 4, p. 3751, operative July 1, 1978.) Membership was increased to five effective July 1980. (§ 3541 as amended Stats. 1980, ch. 666, urgency eff. July 20, 1980; Stats. 1980, ch. 1088, § 1.)

cedures to be used for the evaluation of employees, organizational security pursuant to Section 3546, procedures for processing grievances pursuant to Sections 3548.5, 3548.6, 3548.7, and 3548.8, and the layoff of probationary certificated school district employees, pursuant to Section 44959.5 of the Education Code. In addition, the exclusive representative of certificated personnel has the right to consult on the definition of educational objectives, the determination of the content of courses and curriculum, and the selection of textbooks to the extent such matters are within the discretion of the public school employer under the law. All matters not specifically enumerated are reserved to the public school employer and may not be a subject of meeting and negotiating, provided that nothing herein may be construed to limit the right of the public school employer to consult with any employees or employee organization on any matter outside the scope of representation."

Reassignment policies and the layoff of probationary certificated school district employees were added to the enumerated terms and conditions by statute effective September 7, 1977. (Stats. 1977, ch. 606, § 3, pp. 1989-1990.)

Subdivisions (b) and (c) were added in 1981. They make (1) causes and procedures for disciplinary action other than dismissal affecting certificated employees, and (2) procedures and criteria for the layoff of certificated employees for lack of funds, negotiable notwithstanding specified provisions of the Education Code. If the parties do not reach agreement, the Education Code sections are to apply. (§ 3543.2, as amended; Stats. 1981, ch. 100, § 34, p. 689; Stats. 1981, ch. 1093, § 18.2, p. 4220.)

The tension between the restrictive language of the phrases "shall be limited to" and " 'Terms and conditions of employment' mean . . ." and the expansive language "matters relating to" forms the central controversy in this case.

PERB relies heavily on the phrase "matters relating to " to provide sufficient flexibility to bring within the scope of representation matters which are not themselves specifically listed in section 3543.2. After struggling with the question in a number of decisions (see, in addition to the cases now before us, *Palos Verdes Faculty Assn.* v. *Palos Verdes Peninsula Unified Sch. Dist.* (July 16, 1979) PERB Dec. No. 96; *Jefferson Classroom Teachers Assn.* v. *Jefferson Sch. Dist.* (June 19, 1980) PERB Dec. No. 133; and *Anaheim Secondary Teachers Assn.* v. *Anaheim Union High Sch. Dist.* (Oct. 28, 1981) PERB Dec. No. 177), the currently constituted PERB has adopted a three-step test for assessing negotiability of such items. This test is essentially similar to the test advocated by board member Moore in both of the decisions considered here.

". . . [A] subject is negotiable even though not specifically enumerated if (1) it is logically and reasonably related to hours, wages or an enumerated term and condition of employment, (2) the subject is of such concern to both management and employees that conflict is likely to occur and the mediatory influence of collective negotiations is the appropriate means of resolving the conflict, and (3) the employer's obligation to negotiate would not significantly abridge his freedom to exercise those managerial prerogatives (including matters of fundamental policy) essential to the achievement of the District's mission." (*Anaheim Secondary Teachers Assn.* v. *Anaheim Union High Sch. Dist., supra,* at pp. 4-5.)

PERB asserts that its test conforms to the language and intent of the EERA and of section 3543.2. The test, it urges, distributes potential subjects among three statutory categories (subject to negotiation, subject to mandatory consultation and reserved to management) in a logical way. The test further sensitively assesses the legitimate interests of both labor and management, thereby mirroring the statute's balanced approach. Finally, PERB argues the test allows fairly discrete determinations within general categories of subject matter.

Had the Legislature wanted to decide for itself the negotiability of each of the myriad of specific, detailed contract proposals that would arise in the course of collective negotiations, it could have enacted a statute as specific as those in force in the States of Wisconsin and Nevada.[5]

---

[5]Wisconsin Statutes, section 111.91 (1) permits bargaining to the point of impasse on: "wage rates, as related to general salary schedule adjustments . . . and salary adjustments upon temporary assignment of employees to duties of a higher classification or downward reallocations of an employee's position."

Section 111.91 (2)(b), however, forbids bargaining on: "policies, practices and procedures of the civil service merit system relating to:

"1. Original appointments and promotions specifically including recruitment, examinations, certification, appointments and policies with respect to probationary periods.

"2. The job evaluation system specifically including position classification, position qualification standards, establishment and abolition of classification, assignments and reassignment of classification to salary ranges, and allocation and reallocation of positions to classifications, and the determination of an incumbent's status resulting from position reallocations."

Nevada Statutes, section 288.150, provides in part:

"2. The scope of mandatory bargaining is limited to:

"(a) Salary or wage rates or other forms of direct monetary compensation.

"(b) Sick leave.

"(c) Vacation leave.

"(d) Holidays.

"(e) Other paid or nonpaid leaves of absence.

"(f) Insurance benefits.

"(g) Total hours of work required of an employee on each work day or work week.

"(h) Total number of days' work required of an employee in a work year.

"(i) Discharge and disciplinary procedures. . . .

". . . . . . . . . . . . . . . . . . .

"(s) Teacher preparation time.

By using the language of section 3543.2, however, the Legislature purposely left these determinations to PERB's expertise. The test developed focuses directly on the relative interests of the employer, employees and employee representatives, exposing to public view and to meaningful court review PERB's reasoning process as to each proposed subject of negotiation.

The districts challenge PERB's test as contrary to an asserted legislative intent to establish a strictly limited scope of representation. They find this intent in the limiting language of section 3543.2, the reservation of all nonenumerated matters to the employer's discretion, and the language of section 3540 providing that "[n]othing contained herein shall be deemed to supersede other provisions of the Education Code and the rules and regulations of public school employers which establish and regulate tenure or a merit or civil service system . . . ."

The districts insist that something greater than a logical and reasonable relationship is required to bring a subject which is not specifically named in the statute within the scope of representation. The districts each suggest a test which would more accurately reflect the legislative intent they discern.

The San Mateo District would first ask whether the proposed subject is either enumerated or a direct extension of an enumerated subject. If so, the second and third steps of the PERB test would apply. The Healdsburg Districts would ask first whether the substance of the proposed area is included in the mandatory subjects of negotiation. If so, the Healdsburg Districts would find the proposed area negotiable only if it did not supersede existing Education Code provisions.

II

■ We conclude that PERB's interpretation conforms to the language and purpose of the EERA. Both the history of that statute and the language

---

"(t) Procedures for reduction in work force.

"3. Those subject matters which are not within the scope of mandatory bargaining and which are reserved to the local government employer without negotiation include:

"(a) The right to hire, direct, assign or transfer an employee, but excluding the right to assign or transfer an employee as a form of discipline.

"(b) The right to reduce in force or lay off any employee because of lack of work or lack of funds, subject to paragraph (t) of subsection 2.

"(c) The right to determine:

"(1) Appropriate staffing levels and work performance standards except for safety considerations;

"(2) The content of the workday, including without limitation workload factors, except for safety considerations;

"(3) The quality and quantity of services to be offered to the public; and

"(4) The means and methods of offering those services."

employed indicate that the Legislature intended to enact a scope of representation more restricted than that conferred by prior law while at the same time strengthening employee's rights to bargain for binding agreements and preserving their rights to consult on certain policy matters. The fact that matters which touch both fundamental educational policy decisions and traditionally recognized conditions of employment are specifically included within the scope of bargaining (i.e., class size, evaluation procedures, layoff of certain probationary employees) shows that no rigidly limited scope was intended.

## A. *The Winton Act*

The EERA was preceded by the Winton Act. (Stats. 1965, ch. 2041, § 2, p. 4660, repealed Stats. 1975, ch. 961, § 1, p. 2247; formerly codified at Ed. Code, § 13080 et seq.; see, *Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168, 176 [172 Cal.Rptr. 487, 624 P.2d 1215].) The Winton Act gave public school employees, through their representatives, broad rights to meet and confer on "*all matters relating to employment conditions and employer-employee relations, including, but not limited to wages, hours and other terms and conditions of employment.*" (Former Ed. Code, § 13084, italics added.) In addition, the Winton Act required the public school employer, or its representative, to meet and confer with representatives of certificated employees "with regard to procedures relating to the definition of educational objectives, the determination of the content of courses and curricula, the selection of textbooks and other aspects of the instructional program to the extent such matters are within the discretion of the public school employer. . . ." (Former Ed. Code, § 13085 as amended in 1970.)

The Winton Act allowed a factfinding procedure for resolving persistent disagreements. But the results of such a procedure were not binding. (Former Ed. Code, § 13807.1.) As with the EERA, final decision was reserved to the employer. (Former Ed. Code, § 13088.) The Winton Act did not authorize school employers to enter into binding agreements as a result of the meeting and conferring process. (*Grasko* v. *Los Angeles City Board of Education* (1973) 31 Cal.App.3d 290 [107 Cal.Rptr. 334].)

In *San Juan Teachers Association* v. *San Juan Unified Sch. District* (1974) 44 Cal.App.3d 232 [118 Cal.Rptr. 662] the Court of Appeal interpreted Education Code sections 13084 and 13085 so broadly as to include the formulation of educational policy within the scope of representation for certificated employees.

The court found the facts that teachers had no right to engage in true collective bargaining and no right to strike under the Winton Act were offset by a

broad definition of the scope of matters subject to meeting and conferring. The broad scope also recognized that certificated employees could make constructive contributions to the formulation of educational policy. (*Id.*, at p. 249; see also, *Grasko* v. *Los Angeles City Board of Education, supra,* 31 Cal.App.3d 290; *California Federation of Teachers* v. *Oxnard Elementary Sch.* (1969) 272 Cal.App.2d 514 [77 Cal.Rptr. 497].)

Thus, all matters relating to the implementation of a counseling program, including qualification criteria for and selection of the counselors themselves, were necessarily included within the "inherently broad scope" of "all matters relating to employment conditions and employee relations." The court also held certain matters of budgeting and spending priorities to be within the scope of representation. "The fiscal matters mentioned in the judgment not only all bear directly on teachers' salary increases (i.e., 'wages' ([former Ed. Code], § 13084) but also, to some extent, bespeak 'the formulation of educational policy' ([former Ed. Code,] § 13080); hence they are manifestly embraced by the inclusion in [former Ed. Code] sections 13084 and 13085 of 'all matters relating to employment conditions and employer-employee relations. . . .' The Board's disagreement with the plain meaning of those sections is a point of view which only the Legislature can vindicate by statutory repeal or amendment." (*Yuba City Unified Education Assn.* v. *Board of Trustees of the Yuba City Unified School Dist.*, consolidated with *San Juan Teachers Assn., supra,* 44 Cal.App.3d at pp. 257-258.)

## B. *Legislative Response*

One year later the Legislature enacted the EERA. We presume it was aware of the sweeping interpretation given the scope of representation under the Winton Act. (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56 [81 Cal.Rptr. 465, 460 P.2d 137]; *Rios* v. *Cozens* (1972) 7 Cal.3d 792 [103 Cal.Rptr. 299, 499 P.2d 979]; *Enyeart* v. *Board of Supervisors* (1967) 66 Cal.2d 728 [58 Cal.Rptr. 733, 427 P.2d 509]; *Sutter Hospital* v. *City of Sacramento* (1952) 39 Cal.2d 33 [244 P.2d 390].)

The language of the EERA defines a scope that appears significantly more limited than that under the Winton Act. (See, Mathiason et al., *Scope of Bargaining: The Management Perspective* (1978) 18 Santa Clara L.Rev. 861; Tepper & Mellberg, *Scope of Bargaining for Teachers in California's Public Schools* (1978) 18 Santa Clara L.Rev. 885.) "*[A]ll* matters relating to employment conditions and employer-employee relations, *including but not limited to* wages, hours and other terms and conditions of employment" which were proper subjects of meeting and conferring under the earlier act, became "*limited to matters relating to* wages, hours of employment, and other terms

and conditions of employment" when subject to negotiation under the EERA. Terms and conditions are now defined to *"mean* health and welfare benefits . . . leave, transfer and reassignment policies . . . [etc.]." (§ 3543.2, italics added.) By contrast Senate Bill No. 400 (the Moscone Act), which passed the 1974 Legislature but was vetoed by the Governor, provided in very broad language for negotiation of "the terms and conditions of service and other matters which affect the working environment of employees. . ..." (See Rodda, Foreword, *Public Employment Relations Symposium* (1978) 18 Santa Clara L.Rev. 845, 847.)

Under the EERA the "definition of educational objectives, the determination of the content of courses and curriculum, and the selection of textbooks to the extent such matters are within the discretion of the public school employer under the law" are matters on which the exclusive representative has only the right to consult. "All matters not specifically enumerated are reserved to the public school employer and may not be a subject of meeting and negotiating . . ." under the current law.

Although it defines a more restricted scope of bargaining, the EERA also expresses a legislative determination that the process of collective negotiations furthers the public interest by promoting the improvement of personnel management and employer-employee relations within the public school systems. (§ 3540.) Employees' rights to *bargain* under the EERA are significantly stronger than the right to meet and confer established by the earlier Winton Act.

The EERA protects employees' rights to consult on certain policy matters. Further it includes within scope of bargaining certain matters which touch both fundamental educational policy decisions and the conditions of employment (i.e., class size, evaluation procedures, layoff of certain probationary employees).

C. *Scope of Representation Under EERA*

In light of these provisions, we cannot agree with the districts that EERA embodies a scope of negotiations that is strictly limited to the subjects specifically named in the statute. Nor, when read in the context of the entire statute, does the reservation of "all matters not specifically enumerated" to the employer, serve to eliminate the flexibility provided by definition of the scope of representation as "limited to matters relating to" the various named items.

■ The districts' reliance on various legislative reports summarizing EERA, all of which describe the scope of representation without mentioning the

"matters relating to" language, is misplaced. (See, Legis. Counsel's Dig. of Sen. Bill No. 160 (1975 Reg. Sess.); Sen. Com. on Ed., Staff Rep. on Sen. Bill No. 160 (1975 Reg. Sess.); Assem. Third Reading, Staff Analysis of Sen. Bill No. 160 (1975 Reg. Sess.); Assem. Com. on Ways and Means, Staff Rep. on Sen. Bill No. 160 (1975 Reg. Sess.).) While such records may, of course, be indicative of legislative intent (*People* v. *Superior Court (Douglass)* (1979) 24 Cal.3d 428, 434 [155 Cal.Rptr. 704, 595 P.2d 139]), they cannot be used to nullify the language of the statute as it was in fact enacted.

◼ Similarly, the San Mateo District's reliance on statements by the sponsor of the legislation, Senator Rodda, is misplaced. " 'In construing a statute we do not consider the motives or understandings of individual legislators who cast their votes in favor of it. [Citations.] Nor do we carve an exception to this principle simply because the legislator whose motives are proffered actually authored the bill in controversy [citation]; no guarantee can issue that those who supported his proposal shared his view of its compass.' (*In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589-590 [128 Cal.Rptr. 427, 546 P.2d 1371].)" (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 700 [170 Cal.Rptr. 817, 621 P.2d 856].) Moreover, the statements in Senator Rodda's article support only the conclusion that scope under the EERA is more restricted than it was under the Winton Act, not the conclusion that the Legislature placed in the statute words which were intended to have no meaning. (See Rodda, Foreword, *Public Employment Relations Symposium: Collective Bargaining in the California Schools, supra,* 18 Santa Clara L.Rev. 845.)

The process of collective bargaining between public school employees and school districts is, of course, affected by the difference between motivations and responsibilities of private and public sector employers. Public entities do not operate for profit but must accommodate the needs of their constituents for efficient and affordable public services. Particularly in the field of education a strong public policy renders the welfare of those receiving the service a primary consideration. (See *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 605 [96 Cal.Rptr. 601, 487 P.2d 1241]; *Centinela Valley Secondary Teachers Assn.* v. *Centinela Valley Union High Sch. Dist.* (1974) 37 Cal.App.3d 35, 43 [112 Cal.Rptr. 27]; *Knickerbocker* v. *Redlands H. Sch. Dist.* (1942) 49 Cal.App.2d 722, 727 [122 Cal.Rptr. 289].) California law requires that school district business be conducted at public meetings, after notice to the community. (§ 54950 et seq.; Ed. Code, § 35145.) The public must be allowed to address the governing board and may require that specific items be considered. (Ed. Code, § 35145.5.) Thus the opportunity for significant public participation is guaranteed.

The districts assert that the collective bargaining process transforms the traditionally multilateral nature of governmental decisionmaking into a bilateral pro-

cess. As to subjects within the scope of mandatory bargaining, input from members of the public at large is excluded and school employees gain a significant advantage in pressing their own interests. (See Summers, *Public Employee Bargaining: A Political Perspective* (1974) 83 Yale L.J. 1156, 1164; Wellington & Winter, *The Limits of Collective Bargaining in Public Employment* (1969) 78 Yale L.J. 1107.) Thus the districts assert that the public interest in education mandates a narrowly limited scope of bargaining.

We cannot agree. The EERA recognizes the importance of public participation in decisions affecting the educational process even as to matters clearly within the scope of representation. Initial contract proposals made by both sides must be presented at a public meeting and thereafter become matters of public record. The public must be allowed a reasonable time to become informed of the proposals and to express its views at a public meeting prior to commencement of employer-employee negotiation. Any new subject introduced into the collective bargaining process must be made public within 24 hours and the public must be informed of any votes cast upon the subject by the employer. (§ 3547.) Thus, although the public is excluded from actual negotiating sessions (§ 3549.1), its opportunity to be fully informed and to express its views is preserved.

### D. *Relationship of EERA and the Education Code*

The school districts' final argument concerns the language of section 3540 pertaining to the relationship between EERA and provisions of the Education Code. The districts claim both that section 3540 demonstrates a legislative intent to define a narrowly restricted scope of representation and that PERB has misapplied the section in the *Healdsburg* case.

Section 3540 generally defines the purposes of the EERA. Paragraph one provides in pertinent part: "Nothing contained herein shall be deemed to supersede other provisions of the Education Code and the rules and regulations of public school employers which establish and regulate tenure or a merit or civil service system or which provide for other methods of administering employer-employee relations, so long as the rules and regulations or other methods of the public school employer do not conflict with lawful collective agreements."

In the *Healdsburg* case PERB interpreted this language to prohibit negotiations only where provisions of the Education Code would be "replaced, set aside or annulled by the language of the proposed contract clause." In the words of board member Moore, "Unless the statutory language [of the Education Code] clearly evidences an intent to set an inflexible standard or insure im-

mutable provisions, the negotiability of a proposal should not be precluded." (*Calif. Sch. Employees Assn.* v. *Healdsburg Union High Sch. Dist., supra,* at p. 18.)

■ PERB's interpretation reasonably construes the particular language of section 3540 in harmony with the evident legislative intent of the EERA and with existing sections of the Education Code. This, rather than the preemption theory offered by the Healdsburg Districts, is the correct approach when several provisions of state law address a similar subject. (*Industrial Welfare Com.* v. *Superior Court* (1980) 27 Cal.3d 690, 723 [166 Cal.Rptr. 331, 613 P.2d 579]; *Certificated Employees Council* v. *Monterey Peninsula Unified Sch. Dist.* (1974) 42 Cal.App.3d 328 [116 Cal.Rptr. 819].) It is consistent with the fact that the EERA explicitly includes matters such as leave, transfer and reassignment policies within the scope of representation, even though such matters are also regulated by the Education Code. (See, Ed. Code, § 44963 et seq. [pertaining to certificated employees] and § 45105 et seq. [pertaining to classified employees].)

PERB's approach is consistent with judicial interpretations of substantially similar language which appeared in the Winton Act.[6] In *Certificated Employees Council* v. *Monterey Peninsula Unified Sch. Dist., supra,* 42 Cal.App.3d 328, the Court of Appeal held it permissible for a school district to meet and confer on matters such as tenure notwithstanding the fact the matters were regulated by the Education Code. The court explained that its holding harmonized sections of the Education Code bearing on the same general subject and effectuated the purpose of strengthening existing tenure rules by promoting orderly and uniform communication between teachers and administrators. (*Id.,* at pp. 333-335.)

PERB's approach is also consistent with the approach taken by the Court of Appeal in *Sonoma County Bd. of Education* v. *Public Employment Relations Bd.* (1980) 102 Cal.App.3d 689 [163 Cal.Rptr. 464]. There school employees sought to negotiate wages for individual job classifications. Although Education Code section 45268 forbids salary changes which effectively "disturb the relationship which compensation schedules bear to one another," the court held negotiation of salary adjustments for individual job classifications permissible provided that the relationship between positions established by the personnel commission remained intact. (*Ibid.*)

---

[6]Former Education Code section 13080 provided: "Nothing contained herein shall be deemed to supersede other provisions of this code and the rules and regulations of public school employers which establish and regulate tenure or a merit or civil service system or which provide for other methods of administering employer-employee relations."

The Healdsburg Districts make two objections to PERB's interpretation. First, they would find subjects which are covered by the Education Code to be within the realm of collective negotiations only if expressly listed in section 3543.2. This argument is but an extension of their argument that the EERA establishes a scope of negotiations narrowly limited to hours, wages, and those terms and conditions of employment which are specifically named in the Government Code.

The Healdsburg Districts' second objection is based on the argument that some parts of the Education Code exhibit a legislative intent to fully occupy the field to which they pertain thereby denoting that the Legislature also clearly intended to preclude collective negotiations and agreements in the same field. Where such statutory schemes are involved, a contract proposal may be in conflict without "annulling" the statute, and negotiations should be prohibited.

The primary example offered is those sections establishing a scheme for the layoff of classified employees. (Ed. Code, §§ 45101, subd. (g), 45114, 45115, 45117, 45298, and 45308.) Another example would be found in Education Code sections 45113 and 45116, pertaining to causes and procedures leading to disciplinary action.

We agree with the Healdsburg Districts that these particular statutes mandate certain procedures, protections and entitlements for classified employees who are to be laid off or disciplined. The intent of section 3540 is to preclude contractual agreements which would alter these statutory provisions.

Where statutes are mandatory, as are these, a contract proposal which would alter the statutory scheme would be nonnegotiable under PERB's application of section 3540 because the proposal would "replace or set aside" the section of the Education Code. In the *Healdsburg* case PERB found all proposals pertaining to layoffs and discipline which conflicted with the standards of the Education Code to be nonnegotiable. PERB did allow negotiations which might culminate in the inclusion of the terms established by the Education Code within a collectively negotiated contract. Such an agreement would not supersede the relevant part of the Education Code, but would strengthen it. (See, *Certificated Employees Council* v. *Monterey Peninsula Unified Sch. Dist., supra.*)

In summary, we hold that PERB has now adopted a method for determining the negotiability of items not specifically listed in section 3543.2 which is consistent with the purposes and intent of EERA. We hold also that PERB has properly interpreted the language of section 3540 which provides that EERA does not supersede specific provisions of the Education Code.

Because of a lack of agreement among the members of PERB, the statutory interpretations we approve today were not uniformly applied to the facts of the two cases before us. In reviewing the orders of agencies similarly empowered, we have previously recognized that " 'an administrative determination in which is embedded a legal question open to judicial review does not impliedly foreclose the administrative agency, after its error has been corrected, from enforcing the legislative policy committed to its charge.' [Citations.] . . . (*NLRB* v. *Food Store Employees* (1974) 417 U.S. 1, 9-10 [40 L.Ed.2d 612, 618, 94 S.Ct. 2074].)" (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd., supra,* 26 Cal.3d at p. 39.) We have then returned the cases to the agencies after directing them to the proper legal standard. (*Ibid.*; see also, *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721 [175 Cal.Rptr. 626, 631 P.2d 60]; *San Clemente Ranch, Ltd.* v. *Agricultural Labor Relations Bd.* (1980) 29 Cal.3d 874 [176 Cal.Rptr. 768, 633 P.2d 964].)

Accordingly, the decisions of PERB are annulled and the cases are remanded for further proceedings consistent with the views expressed in this opinion.

Bird, C. J., Mosk, J., Richardson, J., Kaus, J., Broussard, J., and Racanelli, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.